Hovey *v.* Hobson.

## Edwin S. Hovey *versus* Almon L. Hobson.

The presiding Judge cannot be required to rule upon the force and effect of testimony upon the position as it is produced; and neither is he under any obligation to make known his views of the relative condition of parties as to the burden of proof at every stage of a trial.

A new trial will not be granted on account of the permission of an improper question, when it is manifest that the answer could not have prejudiced the excepting party.

Where, in the trial of a writ of entry, the validity of a deed under which the defendant holds is attacked upon the ground of the mental incapacity of the grantor at the time of its execution, a paper purporting to be the last will and testament of said grantor, wherein he makes his nephew instead of his daughter residuary legatee, is too remote and uncertain in its character, and opens too many collateral issues to be admissible.

So is a trust deed of certain stocks and notes from said grantor to his former guardian, made for the avowed purpose of carrying into effect the sundry provisions of said will.

A letter, dated a few days before such deed, written by a relative to the former guardian of such grantor, advising the sale of the land described in such deed, and the mode of securing payment to the grantor's wife, is no part of the *res gestae*, and is not admissible as an ancient contemporaneous document.

To sustain an exception to the admission of testimony, it is incumbent upon the excepting party to make it apparent that there was no phase of the case as presented at *nisi prius* which authorized the admission.

A party cannot be considered as aggrieved by the omission to instruct in form as requested, if the rule, which ought, of right, to govern the decision of the case, was clearly and intelligibly given.

Where, in the trial of a writ of entry, the validity of the deed under which the defendant claims is controverted upon the ground of the incapacity of the grantor, by reason of mental disease, the presiding Judge submitted to the jury certain written questions embracing the substance of the issue, with such instructions as could not fail to give the jury to understand that, upon their answers or some of them at least, the rights of the parties must depend, reserving his instructions as to the legal effect of the answers until these questions were settled: — *Held*, that there was no error in such a proceeding.

Thus, where the questions submitted to the jury were, — (1,) was the grantor, at the time of executing and delivering the deed in controversy, of sound mind? accompanied with the instruction substantially, that he presented no inquiry but simply that of absolute soundness of mind; to which the jury answered that they were unable to agree upon a direct answer: — and

(2,) did the grantor execute and deliver said deed at, or about its date, understanding and comprehending the nature of his act, the consideration to be paid, and that he was thus transferring the title of the property therein described to the grantee, and the consideration to himself? accompanied by proper instructions; to which they answered, "he did;" and thereupon the presiding Judge instructed the jury that, upon their finding, the defendant was entitled to their verdict: — *Held*, that these proceedings were unexceptionable; the ruling in substance being that ability to execute and deliver a deed, understanding and comprehending the nature of the act, the consideration to be paid, and that he was thereby transferring the title to his property to the grantee and the consideration to himself, indicates sufficient soundness of intellect in the grantor to make the conveyance valid, though it be uncertain whether his was in all respects and absolutely sound.

On Exceptions.

Writ of Entry to recover a certain lot of land on State street in Portland. Writ dated July 24, 1858. Plea, general issue and joinder.

The plaintiff read in evidence a deed covering the premises, from Lydia L. Dennett to himself, dated July 15, 1858. He also introduced evidence tending to show that one Stephen Neal owned the premises, in 1833, 4 & 5, and died intestate, Dec. 28, 1836, aged 74 years, leaving said Lydia L. Dennett, then the wife of Oliver Dennett, his sole surviving child and heiress at law; that she was married to said Oliver in 1822, and that said Oliver died December 18, 1851.

The defendant read in evidence a deed dated July 27, 1835, from Stephen Neal to Samuel E. Crocker, together with the several mesne conveyances from Crocker to himself, each of which covered the premises in controversy.

The plaintiff then read in evidence a copy of the record of a decree of the Probate Court, in and for the county of Cumberland, passed April, 1834, wherein the Judge declares that, " it being fully proved * * that the said Stephen Neal is *non compos mentis* and incapable of taking care of himself, I do therefore decree that a guardian be appointed over him * * and that Neal Dow, of Portland, be appointed guardian," &c.

The defendant then offered a record from the same Court of a petition signed by said Neal Dow, representing " that within a few months the bodily and mental powers of his ward have very much improved, so that he is believed to be capable of managing his own affairs and taking care of himself, which he is desirous to do.   His improvement in his health and general condition is apparent to all his friends, who are not only willing but desirous that he should now be relieved from the legal disability under which he has been placed, and should have once more the absolute control of his person and property."   Also, of the decree upon said petition, passed Sept., 1834, wherein it is declared that, " upon the foregoing petition and representation, the facts therein stated being fully proved, I do therefore decree that the said Neal Dow be dismissed and removed from his office and trust of guardian of Stephen Neal."   The plaintiff objected to the record of removal as evidence of said Neal's restoration to a sound mind, because it does not show notice of said proceedings to Lydia L. Dennett, his grantor, the then presumptive heiress of said Neal; but did not object to it as evidence of the removal of the guardian, and that said Neal was without a guardian July 27, 1835, when he executed the deed to Crocker, under whom the plaintiff claims.   Upon the statement of the defendant's counsel, that he did not offer it as evidence of said Neal's restoration to a sound mind, the presiding Judge allowed it to be read.

Thereupon the plaintiff's counsel requested the Court to rule that the burden was upon the defendant to prove that said Neal had been restored to a sound mind, subsequent to the appointment of the guardian and prior to the execution of the deed of July 27th; but the Judge declined, remarking, that " he did not feel called upon to determine, at this stage of the proceedings, whether or not the plaintiff had made out a case."

Much evidence was put in by both parties, — that of the plaintiff tending to show that said Neal was, at the time he

executed said deed to said Crocker, of unsound mind, and that of the defendant, that said Neal was of sound mind.

Dr. H. M. Harlow, called as an expert, by the plaintiff, having testified in his examination in chief in answer to several hypothetical questions, put by the plaintiff, involving facts claimed by the plaintiff as proved, and facts anticipated in defendant's proof, to his opinion that Neal was of unsound mind, and that it was a marked case of *senile dementia*, and, having given some testimony as to the character of the disease, was asked on cross-examination, " whether, taking all the facts on both sides to be proved, was or not in your opinion, Stephen Neal, on the 27th day of July, 1835, of so unsound mind as to be incapable of transacting the ordinary business of life?" The question was objected to as involving a question of law; but the Court allowed it to be put, and the witness answered :—" Such a person's mind is sometimes clearer than at others. I cannot draw the line how unsound the mind must be to render a man legally incompetent to do business. But I should say he was of unsound mind, and a fit subject for a guardian. I cannot say whether he was capable of transacting ordinary business or not."

Plaintiff had put in evidence tending to show that said Neal, before his alleged unsoundness of mind, was very much attached to his said daughter Lydia, and that upon receiving a large inheritance from a deceased brother in 1832, he said,—" it would not do *him* much good, as he was an old man, but it might do Oliver and Lydia some good; and, in connection with this, the plaintiff offered an original paper bearing the signature of Stephen Neal, dated Oct. 29, 1835, the body of it being in the handwriting of Neal Dow, his former guardian, and purporting to be said Neal's last will and testament, as proper evidence to go to the jury as an insane act, and to prove an unsound state of mind; but the Court excluded it.

The defendant testified that he occupied the demanded premises, that he purchased them in Oct. or Nov., 1854;

that he lived in the other tenement of same block as early as the fall of 1850. His counsel then asked him " whether he paid a valuable consideration for the premises? and whether, at the time he purchased, he knew of any defect in the title of said premises?" The plaintiff seasonably objected to each of these questions, as being immaterial and irrelevant, and calculated to improperly influence the minds of the jury; but the Court overruled the objections, and allowed them to be put, and the witness answered affirmatively to the former and negatively to the latter.

The plaintiff offered an original paper purporting to be a letter from one David Green, whose signature was proved, dated " Ware, N. H., July 7, 1835," addressed to Neal Dow, acknowledging receipt of a letter, advising as to the sale of certain land owned by Stephen Neal and the mode of securing the payment, &c.; but the Court excluded it.

The plaintiff also offered an original paper purporting to be a receipt from said Green, whose signature was proved, dated Oct. 12, 1835, of a portion of the proceeds of certain land of Stephen Neal's, sold as by the letter offered, &c.; but the Court excluded it.

He also offered a paper purporting to be a copy of a paper, dated Nov. 20, 1835, and called by him a "trust deed," which Neal Dow, on a former trial, testified was a copy of the original. The paper purported to be a deed signed by Stephen Neal, conveying to Neal Dow in trust, ("for the purpose of carrying into effect conclusively and irrevocably sundry provisions of my last will and testament touching the disposition of my property,") certain stocks, notes, &c., authorizing said Dow to manage the property thus conveyed according to his best judgment for the aforesaid purposes. But the presiding Judge excluded it.

The plaintiff requested the Court to give the following instructions: —

1st. The principal question for you to decide in this case, is whether Stephen Neal, on July 27th, 1835, the day he executed said deed to Samuel E. Crocker, was *non compos*

*mentis*, or, which means the same thing, was of *unsound mind.*

2d. These terms have a fixed and determinate signification in law, and mean a mental incapacity to manage one's affairs and transact business, " with intelligence and an intelligent understanding of what he is doing."

3d. If Stephen Neal was, at the time of the execution of said deed to Crocker thus *non compos mentis* or of unsound mind, according to the above definition, then said deed to Crocker was invalid and did not convey the title of said premises, but the title still remained in Neal till his death, and then descended to his daughter, Mrs. Dennett, subject to life estate in her husband during his life; and she could not commence an action for possession till after his death; for she had no right of possession till that time; and her right of action would not be barred till twenty years had elapsed from that time, viz., — from the death of her husband.

4th. If said estate descended to her at her father's death, as above, then her title passed by her deed of July 15, 1858, to this plaintiff, and he acquired by that deed all the rights which she had or would have had if she had not given it; and his right to recover in this action is precisely the same as hers would have been had she not given said deed to the plaintiff, but had brought this action in her own name.

5th. The terms of that sale from Mrs. Dennett to plaintiff are not material to this case, and not a subject for your consideration; under modern legislation, she had a perfect right to sell to plaintiff and he had a perfect right to buy on such terms as were mutually satisfactory to themselves. (This instruction was given, and evidence of the consideration excluded.)

6th. Nor is it material whether Crocker or any of the subsequent purchasers, down to, and including this defendant, were ignorant of said Neal's incapacity, if it existed, nor whether they paid a full and fair value for the land at the time they severally purchased. Neither the ignorance

of defendant or of his grantors, back to and including said Crocker, of Neal's incapacity, nor their paying the full value of the property, helps their title in the least, if it was originally invalid for the cause alleged; but it would still be invalid into whosoever hands it might come, and whatever the consideration paid, unless subsequently ratified and confirmed by some one having authority and capacity to ratify it.

7th. "An insane grantor has not the capacity to convey an indefeasible title, and this incapacity inheres in all titles derived from him. The grantee whose title is thus derived must rely on the covenants of his deed. He risks the capacity to convey of all through whom his title has passed. The right of infants and of the.insane alike, to avoid their contracts, is an absolute and paramount right superior to all equities of other persons, and may be exercised against *bona fide* purchasers from the first grantee."

8th. The main question, therefore, for you to decide, is whether Stephen Neal, on the 27th day of July, 1835, was *non compos mentis* or of *unsound mind* as above defined; that is, had he mental capacity sufficient to enable him *alone* and unaided by others to manage his affairs, and transact business with intelligence and an intelligent understanding of what he was doing. If he had not, then he was not legally competent to act, and said deed to Crocker was invalid and conveyed no title, and plaintiff would be entitled to recover.

9th. "One of the obvious grounds on which the deed of an insane man or an infant is voidable, is not merely the incapacity to make a valid sale, but the incapacity prudently to manage and dispose of the proceeds of the sale." *Gibson* v. *Soper*, 6 Gray 282. So that, "to transact business with intelligence and an intelligent understanding of what he was doing," he must not only have intelligence enough to know the value of the property he was selling, but also he must have intelligence enough prudently to manage and dispose of the proceeds. And if he had not intelligence enough for this, but lost the proceeds, or was liable to lose

them through want of such intelligence, then he was not competent to transact business, to sell his property or execute said deed. For he would be no better off if he had not intelligence to take care of and. manage the proceeds than if he did not know the value of the property, but gave it away or sold it for an inadequate consideration. If you find from the evidence in the case, therefore, that Stephen Neal had not such intelligence as above described, at the time he executed said deed to Crocker, the plaintiff will be entitled to your verdict.

10th. The record of the original decree of guardianship by the Probate Court, of the third Tuesday of April, 1834, is conclusive evidence that, at that time, said Neal was *non compos mentis* or of unsound mind, as above defined, and that he was at that time incompetent to manage his affairs and transact business. And, having been thus proved to have been incompetent, prior to the execution of said deed to Crocker, the presumption is that his incompetency continued down to and subsequent to the execution of said deed, unless he has been proved by the evidence in the case to have been restored to a sound mind after said decree was made and prior to the execution of said deed.

11th. The record of the removal of the guardian, in Sept., 1834, put in by the defendant, although it removed his legal disability and left him free to execute said deed to Crocker, if he was restored to mental competency, yet said removal having been made without any notice to Mrs. Dennett, or any one else adversely interested, direct or implied, it is no evidence against her or her grantee, (this plaintiff,) that said Neal was restored to mental competency; and it was not introduced by defendant for that purpose, but only to show that he was under no legal disability, provided he was so restored. But his restoration to a sound mind or mental competency must be proved by other evidence in the case; and the burden is on defendant to prove this, and, if he has not done it to your satisfaction, by a preponderance of evidence, then his incompetency, arising from *senile dementia*,

as it does in this case, is presumed to have continued till the execution of said deed, and plaintiff will be entitled to your verdict.

Upon the subject matter of the 10th request, the jury were instructed that the record of the original decree of guardianship, of April, 1834, was conclusive evidence that, in that case, it was fully proved to the Probate Court that Stephen Neal was then *non compos mentis* and incapable of taking care of himself, and such other instructions as hereafter appear.

Upon the subject matter of the 11th request, the record of the removal of the guardian, in Sept., 1834, was introduced and received only as evidence of the removal of the guardian, and not as evidence of a restoration of said Neal to a sound mind; and the jury were so instructed, and that it was not competent for them to consider it for any other purpose; and, for this purpose, no objection was made to its admission, as appears in previous portions of the exceptions. Other instructions upon the presumptions of the continuance of sanity or insanity, appear in subsequent portions of the exceptions.

The foregoing instructions the Court declined to give in the form requested. Among other instructions given, the Court instructed the jury as follows: —

"Some discussion has been carried on in your presence as to the mental capacity required to make a valid conveyance, and, as to what is not in law a *non compos*. I do not think it will be necessary to trouble you with a discussion of those questions at present. I think a correct result will be more surely reached by another method.

"I propose to put before you certain questions in writing to be answered by you, and then to give you the law applicable to them. It will leave your minds untrammelled in the consideration of the questions of fact, by any nice distinctions in law, not always made apparent by once stating in a charge to a jury. The questions are as follows: —

"1st. Was Stephen Neal at the time of the deed of July

27, 1835, to Samuel E. Crocker was signed and delivered, of sound mind?

" 2d. Did Stephen Neal execute and deliver the deed of July 27, 1835, to Samuel E. Crocker, at or about its date, understanding and comprehending the nature of his act, the consideration to be paid, and that he was thus transferring the title of the property therein described, to said Crocker, and the consideration to himself?

" 3d. If he did not, was it because he was not of sound mind at the time?

" These questions, you will perceive, all pertain to one point of time, viz., the signing and delivery of the deed of July 27, 1835, to Samuel E. Crocker. The first question, you will see, is, was he of sound mind? No inquiry as to the cause or effect is here made. No inquiry as to the legal or medical name attached to it. No inquiry as to the responsibility of the individual, in whatever mental condition you may find him. It is only the simple plain question, was he of *sound mind?*

." The law presumes every man sane and of sound mind until the contrary has been proved. The law presumes that Stephen Neal was a sane man and of sound mind; and if the plaintiff would avail himself of the fact of unsoundness of mind he must prove it. The burden is upon him to overcome the presumption of law by proof. * * * * * The particular time in question is when the deed was signed and delivered. Acts occurring before and after are only evidence tending to show the mental condition *then.* If the plaintiff has shown that Stephen Neal was at any time during the years 1833, 1834 or 1835, of unsound mind, the law presumes it continued down as late as the signing and delivery of the deed, unless the proof shows to the contrary. * * *

" To show there was no unsoundness either before or after the time in question, the defendants have introduced evidence of many incidents tending to show his sanity. If they have proved he was of sound mind at a period later than the plaintiff proves him of unsound mind, then the pre-

sumption of law comes in that he continued so from the time they thus proved him of sound mind until he is again proved of unsound mind." * * * "Dr. Harlow, upon the assumption that certain facts were proved, has given it as his opinion that Stephen Neal was not of sound mind and that he was afflicted with *senile dementia;* that this disease is intermittent in its character and manifestations; that the patient will appear better some days than others.  Now if he is correct in this matter, is it unreasonable for us to suppose that the principal part of the testimony on both sides may be true, one side relating to the manifestations when in one condition of mind, and the other when in another condition of mind.  May he *not, as one of counsel expressed it,* have been "now upon the hinge and then off?"  If you should find this to have been the condition of Stephen Neal for some considerable portion of the time before and after July 27, 1835, you may find it necessary to carefully consider the evidence nearest to that point of time. * * * * *

"From the evidence, then, was Stephen Neal at the time of signing and delivery of the deed of sound mind?

"The second question, you will perceive, relates to the capacity of Stephen Neal at the time in question.

"Here, as before, the question does not arise as to the cause or name of the unsoundness, or whether it made him what the law denominates *non compos*.  All these matters need not now be discussed.  The question relates to his capacity to understand and comprehend the transaction in question.  It is not whether he could understand the ordinary business of life, but whether he could and did comprehend and understand the transaction in question.  If he could not understand and transact the ordinary business of life, it may be evidence tending to show he did not comprehend this; but you will judge if it necessarily does."

What is or not the ordinary business of life, may be difficult to determine, and may depend upon the peculiar business or situation of the party under examination.  You will judge whether the ordinary business of a farmer is the

same as that of a merchant. Each might be quite ignorant of the daily routine business of the other. The question here put directed your attention to the transaction in question. What the legal effect of an answer to that question shall be, it is not now necessary that I should instruct you.

" Going, then, all over the evidence in this case bearing upon the question, you will answer the question. Upon this question, as well as upon the other, you will examine the evidence with reference to the time when the deed was signed and delivered. I do not propose to go over the evidence bearing upon these questions. I leave it entirely to you to answer these plain, simple questions.

" The third question is designed to ascertain why he did not comprehend, if he did not, whether it arose from an unsoundness of mind.

" You may now retire and consider these questions, and, when you have answered them, you may come into Court for further instructions."

The jury then retired and came in with the following answers : — Answer to first question, — " The jury are unable to agree upon a direct answer to the first question.

" Isaac Johnson, *Foreman.*"

Answer to the second question, — " Yes.

" Isaac Johnson, *Foreman.*"

No answer was returned to the third question.

The Court then instructed the jury that, upon this finding, the defendant was entitled to a verdict, and sent them out with a verdict filled out for the defendant, and the jury returned into Court with a general verdict for defendant, which was affirmed, and also the answer to the second question.

To all which rulings and refusals to rule, the plaintiff excepted.

*Merrill*, for the plaintiff.

1. The jury should have been instructed as to the effect of the record of guardianship, as in 10th and 11th request.

1 Greenl. Ev., §§ 525, 550; *Leonard* v. *Leonard*, 14 Pick., 280; *Kimball* v. *Fisk*, 39 N. H., 117; *Chase* v. *Hatha-way*, 14 Mass., 224; *Hovey* v. *Harmon*, 49 Maine, 269; *Hathaway* v. *Clark*, 5 Pick., 491; *Boynton* v. *Dyer*, 18 Pick., 4; *Gibson* v. *Soper*, 6 Gray, 286; *McGee* v. *Gibson*, 1 B. Munroe, 105; *Briggs* v. *Georgia*, 12 Vermont, 60; *Whitney* v. *Lynde*, 16 Vermont, 679; *Meble* v. *McClintock*, 6 W. & S., 58; *Tuttle* v. *Gates*, 24 Maine, 395; *Lane* v. *Crombie*, 12 Pick., 177; *Penniman* v. *French*, 2 Mass., 144; *Lunt* v. *Aubens*, 39 Maine, 392; *Deering* v. *Adams*, 34 Maine, 41.

2. Questions to Dr. Harlow were illegal and misled and confused the jury. *De Witt* v. *Barley*, 17 N. Y., 347; 2 Kent's Com., 452; *Boyle* v. *Coleman*, 13 Barb., 42; *Leavitt* v. *Leavitt*, 4 Maine, 161; *Winkley* v. *Foye*, 33 N. H., 171.

3. The answer was admissible to prove unsoundness of mind. 4 Stark. Ev., 1707; 9 Ver., 601; *Burr* v. *Duval*, 8 Mod., 59; *Patterson* v. *Patterson*, 6 S. & R., 56; 8 S. & R., 573 – 9; *Dickinson* v. *Barber*, 9 Mass., 225; *Hunt* v. *Adams*, 7 Mass., 518; *Dorsett* v. *Miller*, 3 Sneed, 72; *Whiting* v. *Otis*, 1 Bosw., (N. Y.,) 420; *Baxter* v. *Abbott*, 7 Gray, 71.

4. Defendant's testimony as to consideration and want of knowledge as to defect in title, was inadmissible. *Leavitt* v. *Leavitt, ubi sup.*; *Handly* v. *Call*, 27 Maine, 50; *Ellis* v. *Short*, 21 Pick., 142; *Clark* v. *Vorce*, 19 Wend., 232.

5. The letter from Green was admissible as ancient contemporaneous documents, as part of the *res gestae* to show conspiracy to sell Neal's land, thereby treating him as *non compos*. *Irish* v. *Irish*, 8 S. & R., 573; 2 Stark. Ev., 122, 124; *Oldtown* v. *Shapleigh*, 36 Maine, 279; *Steward* v. *Hanson*, 35 Maine, 509.

6. Copy of trust deed, admissible as an act tending to show insanity of Neal. 4 Stark. Ev., 1707, and cases cited in note 2.

7. 3d, 4th, 6th and 7th requested instructions, setting forth the legal rights of plaintiff to maintain the action,

should have been given. For want of which the jury were left in doubt upon questions of law raised and argued by defendant's counsel. *Meble* v. *McClintock, ubi sup.*

8. 1st, 2d, 8th and 9th requested instructions, stating the true issue and ·properly defining *non compos* or unsoundness of mind, and the legal requirements essential to legal competency, should have been given. *Morton* v. *Fairbanks,* 11 Pick., ˙358; *Commonwealth* v. *Belton,* 5 Cush., 427; *Commonwealth* v. *Barry,* 10 Cush., 480; *Chase* v. *Breed,* 5 Gray, 444, 5; *Stone* v. *Crocker,* 24 Pick., 84, 5 and 6; *De Witt* v. *Barley, ubi sup.*; 2 Kent's Com., 452; 1 Black., 304; *Gibson* v. *Jayes,* 6 Ves. Jr., 273; *Ridgeway* v. *Darwin,* 8 Ves. Jr., 65; *Ex parte Cranmar,* 12 Ves. Jr., 454; *In re Parker,* 2 Johns. Ch., 206; *Johnson* v. *King,* 4 Cow., 218; *Hale* v. *Hills,* 8 Conn., 43; *Gibson* v. *Soper, ubi sup.*; *Bond* v. *Bond,* 7 Allen, 3; 1 Pow. on Con., 3; *Osmond* v. *Fitzroy,* 3 P. Wms., 129; *Hill* v. *Nash,* 41 Maine, 587; *White* v. *Driver,* 1 Phill., 8; 4· Stark. Ev., 1711, note f; *Hovey* v. *Chase,* 52 Maine, ·316; *Harrison* v. *Bowen,* 3 Wash., C. C. R. 580; *Stevens* v. *Van Clerc,* 4 *Ibid,* 262; *Steward* v. *Lispenard,* 26 Wend., 253.

9. The presiding Judge erred (1,) in omitting to give the jury any instructions as to what constituted unsoundness of mind sufficient to avoid a deed; (2,) in the rulings which he did give upon both the first and second questions; and (3,) in ordering the return of a verdict for the defendant upon the answer to a question which was insufficient.

*J. & E. M. Rand,* and *H. P. Deane,* for the defendant.

BARROWS, J.—The motion to set aside the verdict in this case, as against evidence, &c., not being accompanied by the required report of the evidence adduced, must be overruled. The exceptions only are properly before us for consideration. We proceed to consider them *seriatim,* (in the order adopted by the plaintiff's counsel in presenting his argument upon them to this Court,) premising only that, in order to entitle himself to a new trial by means of exceptions,

the excepting party must see to it that he brings before us so much of the case, as it arose at *nisi prius*, as to make it apparent, not merely that the ruling complained of *might be* erroneous in some hypothetical case, but that it *was so* as applied to the case actually presented by the ·testimony, and that the error was of such a character as to affect *his* rights injuriously.

1. The demandant having put in the record of a decree of the Probate Court, passed on the 3d Tuesday of April, 1834, appointing a guardian to Stephen Neal, the tenant offered the record of the same court, showing the removal of said guardian on the 1st Tuesday of September, 1834, upon his own petition, alleging that, "within a few months, the bodily and mental powers of his ward have very much improved, so that he is believed to be capable of managing his own affairs and taking care of himself, which he is desirous to do;" *that* "his improvement in his health and general condition is apparent to all his friends, who are ·not only willing but desirous that he should now be relieved from legal disability, under which he has been placed, and should have once more the absolute control of his person and property." The record further sets forth that, "upon this petition and representation, *the facts therein stated being fully proved*," the guardian was removed.

The exceptions state that the demandant "objected to this record as evidence of said Neal's restoration to sound mind, because it does not show notice of the proceedings to Lydia Dennett, his grantor, the then presumptive heiress of said Neal; but did not object to it as evidence of the removal of the guardian, and that said Neal was without a guardian at the time of the execution of the deed under which the tenant claims." Upon the statement of tenant's counsel that he did not offer it as evidence of said Neal's restoration to a sound mind, the Judge allowed it to be read. Thereupon the demandant's counsel requested the Court to rule that the burden was upon the tenant to prove the restoration of Neal to a sound mind subsequent to the appointment of a

guardian, and prior to the date of the deed under which he claimed, but the Judge declined so to do, remarking, that he " did · not feel called upon to determine at this stage of the proceedings, whether or not the demandant had made out a case." This refusal forms the demandant's first ground of complaint, and is coupled by his counsel, in argument,· with the subsequent refusal to give, in the terms requested, his 10th and 11th requests for instructions, which relate to the effect of these records as evidence. Even if it were clear that the requested instructions could be rightfully claimed when the case was committed to the jury, it would still be very certain that the interposition of such a ruling *in the progress of the trial*, at the request of a party, would be purely matter of discretion with the presiding Judge, and the refusal of it before the completion of the case would be no ground for exceptions. The Judge cannot be required to rule upon the force and effect of every piece of testimony upon the position of the parties as it is produced ; he is under no obligation to make known his views of the relative condition of the parties as to the burden of proof at every stage of the proceedings. It is sufficient if he gives the right direction to the cause when a party has announced that his case is complete. We are to inquire, then, whether the demandant was justly aggrieved in the matter of his 10th and 11th requests. Without stopping to determine as to the correctness of the rulings requested, it is plain that the demandant has no cause of complaint if those actually given were substantially equivalent. *Dunn* v. *Moody*, 41 Maine, 240. Now the case finds that " the jury were instructed that the record of the original decree of guardianship of April, 1834, was conclusive evidence that in that case it was fully proved to the Probate Court that Stephen Neal was then *non compos mentis* and incapable of taking care of himself, — that the record of the removal of the guardian in September, 1834, was introduced and received only as evidence of the removal of the guardian, and not as evidence of the restoration of said Neal to a sound mind, and

that it was not competent for them to consider it except for the purpose for which it was received." The instruction that " the law presumes every man sane and of sound mind until the contrary has been proved," — *that* the "law presumes that Stephen Neal was a sane man and of sound mind ; and if the plaintiff would avail himself of the fact of unsoundness of mind he must prove it, — the burden is upon him to overcome the presumption by proof," if applied to the position of the parties at the commencement of the trial, was unquestionably correct. That it was so applied, and must have been so understood by the jury, appears from the succeeding instructions, as follows : — " The particular time in question is when the deed was signed and delivered. Acts occurring before and after are only evidence tending to show the mental condition *then;* if the plaintiff has shown that Stephen Neal was, at any time during the years 1833, 1834, or 1835, of unsound mind, the law presumes it continued down as late as the signing and delivery of the deed unless the proof shows the contrary." Taken in connection with the previous instructions as to the force and effect of the records of the Probate Court, this certainly leaves *the plaintiff* nothing to complain of, although the presiding Judge did not see fit to adopt the precise words used in the tenth and eleventh requests for instructions.

2. Dr. Harlow, a witness, called as an expert by the demandant, having testified in his examination in chief, in answer to several hypothetical questions put by plaintiff, involving facts claimed by plaintiff as proved and facts anticipated in defendant's proof, to his opinion that Neal was of unsound mind and that it was a marked case of *senile dementia*, and having given some testimony as to the character of the disease, was asked, on cross-examination, " whether, taking all the facts on both sides to be proved, was or not, in your opinion, Stephen Neal, on the 27th day of July, 1835, of so unsound a mind as to be incapable of transacting the ordinary business of life?" The question was objected to as

involving a question of law. If we assume that the question was improper and inadmissible, even on cross-examination, as tending to mislead or to draw from the witness an expression of opinion upon a question of law, still, upon looking at the answer, it is not perceived how it could have been in any manner prejudicial to the demandant. The witness says,—"I cannot draw the line how unsound the mind must be to render a man legally incompetent to do business. But I should say he was of unsound mind and a *fit subject for a guardian,* but I can't say whether he was capable of transacting ordinary business or not." The only thing definite elicited by the question was a repetition of the opinion previously expressed, adverse to the tenant and in more emphatic terms, and applied to the very date of the transaction in controversy. A new trial will not be granted on account of the permission of an improper question, when it is manifest that the answer could not have prejudiced the excepting party. To sustain exceptions for such a cause would be more nice than wise.

3. The next subject of complaint is the exclusion of an original paper bearing the signature of Stephen Neal, dated Oct. 29, 1835, and purporting to be his last will and testament, the body of it being in the handwriting of Neal Dow, his former guardian, which was offered "as proper evidence to go to the jury, as an insane act and to prove an unsound state of mind." The reason assigned for offering this document as evidence of Neal's insanity, is that in and by it the principal part of his property is devised away from his daughter, an only child, to whom there was evidence tending to show that he was very much attached at a period some three years earlier than the date of these transactions. Why it was excluded is not stated in the exceptions. The tenant's counsel suggests that the date of the paper is three months later than the date of the deed, and that whether acts of Stephen Neal offered in evidence are sufficiently near in point of time to bear upon the act in question is a question addressed to the discretion of the presiding Judge and

not subject to exception.   But it would seem that Neal's acts nearer the close of his life, and more remote in time from the giving of the deed, were offered and admitted in evidence, so that this can hardly be considered as the ground of the exclusion.   They further suggest that the body of the paper was not in Stephen Neal's handwriting, and that there is no proof that it was drawn up by his authority or that he knew its contents.   But it might be fairly argued that the execution of such a paper, under *such* circumstances, would afford no slight evidence of a demented condition. One of the counsel says there was no proof of the signature, but this contradicts the exceptions, which describe the document as an original paper bearing Neal's signature.   It is plain that the true reason for the exclusion was none of these. It may be found in the character of the document itself. Remoteness in the *time* of the act is not the only remoteness from the issue between the parties, which may be, in the discretion of the presiding Judge, a proper ground for excluding evidence of the acts of the person whose state of mind is in question.   The sole ground of offering this paper as evidence of insanity is that Neal's nephew, instead of his daughter, is made residuary legatee in it.   But while it is apparently drafted by one not learned in the law nor accurate in the use of legal terms, there is nothing fantastic or absurd in its terms.   Quite a number of bequests to relatives and friends are set forth in an orderly manner, — provision is made for his wife in addition to her dower, and reasons are duly and carefully assigned for preferring his nephew to his daughter, in the residuary clause, which, if based upon actual facts, might, to many sane minds, seem to justify that disposition.   It is plain that, in and of itself, without first raising and settling many collateral issues, the act is not one from which any safe inference as to the state of Stephen Neal's mind could be drawn.   There must be a limit somewhere in the discretion of the Court, even in the prosecution of an inquiry taking so wide a range as this. If such evidence did not tend to prejudice and mislead the

jury, at least it would be likely to consume much time to very little purpose. We think it was rightly excluded as too remote and uncertain in its character, and opening too many collateral issues of inquiry, which the tenant could not be expected to be prepared to meet.

4. The next objection is, that the tenant was allowed to testify that he paid a valuable consideration for the land in dispute, and was ignorant of any defect in the title. When this case was last before this Court, (53 Maine, 451,) it was determined that an insane person has not the power to convey an indefeasible title, and does not convey such title, even to a man dealing with him in good faith and paying an adequate consideration, and that, if the deed has never been ratified, the heir of such insane person may avoid it without returning the price, not only as against the immediate grantee but as against remote purchasers deriving their title through him, who have paid the full value of the land without notice of any defect in the title. It follows that, if the issue depended solely upon the question as to Stephen Neal's sanity, the testimony of the tenant was utterly irrelevant and unquestionably calculated to prejudice and mislead the jury. It is claimed by the tenant's counsel to have been " material as tending to show that defendant has *good* cause to defend his premises against the claims of a worthless speculator, so that the jury might fully understand the substantial ground on which he stood." But that is not a "good" nor a " substantial" ground for defence which has been decided not to be a legal ground.

If, therefore, it had appeared in the exceptions, that the *only* ground on which the demandant claimed to invalidate the deed, was a want of mental capacity in Stephen Neal to make an indefeasible conveyance, it would have been plain that this exception ought to be sustained. But this important fact is not asserted in the exceptions. It is hardly just to call upon us to presume that Mrs. Dennett was guilty of so dishonest an act as to make sale of this property to the demandant, claiming to avoid her father's deed, without even

offering to refund the purchase money which had accrued to her father's estate in the transaction, and hence to her, as his sole heiress at law, if she knew or believed that that deed was made in the absence of all fraud or circumvention to one who dealt with him in good faith, paying a fair equiv- ·alent for the land. It is more natural to suppose that it was claimed on the trial that Stephen Neal was overreached and defrauded in the original sale of the land, and perhaps some testimony was offered by the demandant, tending to show that some undue advantage was taken of him in his old age, to induce him to part with it for less than its fair value. Such claim or evidence would at once account for and jus- tify the admission of the testimony from the tenant now under consideration. For although the Court, in the for- mer hearing of the cause, established the doctrine that "the right of the insane to avoid their contracts is an absolute and paramount right, superior to all equities of other per- sons, and may be exercised against *bona fide* purchasers from the grantee," they did not fail to recognize the previous- ly well established rule, that while a man who is defrauded, may, as against his immediate grantee, avoid his deed, he is not permitted to do so against those deriving, in good faith and for an adequate consideration, a title from such grantee. *Hovey* v. *Hobson*, 53 Maine, 458.

*Inasmuch as it is incumbent upon a party excepting to the admission of testimony, to make it apparent that there was no phase of the case, as presented at nisi prius, which au- thorized the admission,* this exception must fail also.

5. David Green's letter and receipt cannot be considered part of the *res gestae*, or admissible upon any principle known to the law of evidence. Beyond question they were rightly excluded. Conceding all that demandant's counsel claims for them, on the score of antiquity and authenticity, the most strictly legal proof that a man's wife and her broth- er had conspired ever so successfully to appropriate some of his funds to the wife's separate use, would afford no le- gitimate inference against the sanity of the man.

6. The "paper purporting to be a copy of paper dated Nov. 20, 1835, called a trust deed," does not appear to have been offered under such circumstances as would have made a copy admissible, and even the original would have been liable to the same objections, on account of which we hold the testamentary paper of Oct. 29, 1835, to have been rightly excluded. There is nothing in the exceptions upon which to base the argument that it should have been admitted for the purpose of contradicting Neal Dow.

7. The three remaining positions taken in argument by the demandant's counsel, relating, as they do, to certain requested instructions, and to the mode in which the case was put to the jury, may properly be considered together, for, looking at the requests and the instructions given, it is plain that the demandant cannot be considered as aggrieved by the omission to instruct in form as requested, if the rule, which ought of right to govern the decision of the case, was clearly and intelligibly laid down. The right of counsel to call for instructions in matters of law does not comprehend a right to have his arguments repeated and endorsed by the presiding Judge, but only to have the question upon which the jury are to pass, correctly presented to them disencumbered of false issues which might tend to prejudice and lead them astray. It becomes important accurately to ascertain what rule was given to the jury in this case, and upon what finding in matters of fact their verdict was made to depend.

The Judge submitted to the jury three written questions with instructions such as could not fail to give the jury to understand, that upon their answers to these questions, or some of them, the rights of the parties must depend, but reserving his instructions as to the legal effect of the answers until these questions of pure fact should have been settled. It is not perceived that there was error in this. Such a course of proceeding, if the questions did, in fact, embrace the substance of the issue presented, would seem well calculated to secure a fair determination of the exact matters of fact in controversy, unembarassed by irrelevant issues, and

unbiased by prejudice or sympathy for or against either party, and, in a case where the result must depend upon the answers to one or two direct questions, we think neither party can object to the adoption of this course by the presiding Judge in his discretion, in lieu of an attempt to disentangle the case from its embarrassments by specific instructions as to all the matters involved in the outset, an attempt which, in complicated cases, it is to be feared, is not unfrequently rendered abortive by the misapprehension or forgetfulness of the jury. The method pursued here seems to have the merit of simplicity and directness.

We are now to inquire whether the questions did cover the whole issue between the parties, and whether the answer returned justified the direction which the Judge gave. the jury thereupon, to render a verdict for the defendant. The first question was as follows : —" Was Stephen Neal, at the time the deed of July 27, 1835, to Samuel E. Crocker was signed and delivered, of sound mind ?" And the jury answered that they were "unable to agree upon a direct answer to this question."

The second was, —" Did Stephen Neal execute and deliver the deed of July 27, 1835, to Samuel E. Crocker, at or about its date, understanding and comprehending the nature of his act, the consideration to be paid, and that he was thus transferring the title of the property therein described to said Crocker and the consideration to himself." And the jury answered that he did. The third question became immaterial by reason of the answer to the second. Upon these answers the Judge instructed the jury that the defendant was entitled to a verdict, which was accordingly returned.

It is not now contended that the demandant was entitled to recover upon any other ground than the incapacity of Stephen Neal, by reason of mental disease, to make a valid conveyance on the 27th of July, 1835.

If the first question were to be taken as an inquiry whether Stephen Neal was at that time " of sound mind," in the legal acceptation of that term, then the failure of the jury

to agree upon an answer, would have been a failure to agree as to what was vital to the disposition of the case, and the instruction to return a verdict for the defendant would have been erroneous. The grantor *must* be "of sound mind" *as the law understands the phrase,* in order to make a valid conveyance. But it is plain, from the tenor of the instructions given when the question was submitted to the jury, that the inquiry was not so designed to be understood, and was not so understood by them. They were told, in so many words, that "it was not an inquiry as to his responsibility, in whatever mental condition they might find him," and that they need not trouble themselves what legal or medical name to attach to it. It was the naked question—was he of sound mind? i. e. of *absolutely* sound mind, in full possession and exercise of all his mental faculties? and this as contra distinguished from any enfeebled condition of mind which still might be compatible with legal soundness. Their failure, then, to agree upon a direct answer to this question, does not negative the idea that the grantor was of sound mind, *legally speaking,* if the finding in answer to the second question is substantially equivalent to an affirmation of his legal competency to convey. Now, touching this matter of the validity of this conveyance, upon which this case was to turn, the jury have found that the only party to it, whose capacity to consent thereto was doubted, "*did* execute and deliver it, understanding and comprehending the nature of the act, the consideration to be paid, and that he was thus transferring the title to the property therein described, to the grantee and the consideration to himself." Is anything more required to evince an *intelligent assent* on *his part?* or to show that he *was* in "possession of mental capacity sufficient to transact business with intelligence and an intelligent understanding of what he was doing?" The ruling, in substance, is—that ability to execute and deliver a deed understanding and comprehending the nature of the act, the consideration to be paid, and that he was thereby transferring the title to his property

to the grantee, and the consideration to himself, indicates sufficient soundness of intellect in the grantor to make the conveyance valid, though it be uncertain whether his mind was in all respects and absolutely sound. Now in what essential particular does this differ from the rulings and refusals to rule, which were held correct in the suit of this demandant against Chase, involving the same question and title, and reported 52 Maine, 304? There the presiding Judge instructed the jury that "no degree of physical or mental imbecility" (in the grantor) "can avoid his deed if he had legal competency. Legal competency to act, is the possession of mental capacity sufficient to transact business with intelligence and an intelligent understanding of what he was doing;" and he refused to instruct them that, "if he had not sufficient intelligence and understanding to transact business in a proper and provident manner, he was of unsound mind." Thus, the ruling in *Hovey* v. *Chase*, recognizes a distinction between absolute and legal soundness of mind, and the possibility of legal competency to convey where perfect mental soundness is lacking, and makes ability to transact business with an intelligent understanding of what he was doing the test of legal competency in the grantor. Why should it be otherwise? What more could or ought to be done by way of laying down a governing rule for the action of the jury in such cases? The assent of two minds of sufficient intelligence to be capable of comprehending the import of the transaction is necessary to the validity of a contract or conveyance. But *the law* can fix no other or more particular standard of intelligence. Whether mental disease or infirmity has proceeded so far as to destroy that capability is a question of fact to be determined according to the circumstances in each particular case where the validity of the act is in question, and, in the case at bar, was determined by the jury in favor of the tenant in their answer to the second question. Any attempt to lay down other general rules applicable to all cases of this sort would be liable to lead to inextricable confusion and con-

flict in the decisions, and, if adhered to, in many cases, to positive injustice. This seems to have been realized by the Judge, upon whose remark, (in *Gibson* v. *Soper*, 6 Gray, 282,) that " one of the obvious grounds upon which the deed of an insane man is held voidable, is not merely the incapacity to make a valid sale, but the incapacity *prudently to manage and dispose of the proceeds of the sale,*" the demandant's counsel here based one of his requests for instruction; for, in another part of his opinion, referring to the case of *Arnold* v. *Richmond Iron Works*, he says, " the tenant relies upon some remarks of the Chief Justice in delivering the opinion of the Court, as sustaining his position. *Nothing is more unsafe* than to rely upon such remarks taken from the connection and context by which their meaning is limited and qualified. In their relation and application to the facts under discussion, they may be sound and pertinent; wrested from their connection and application and applied to a different state of facts, they may be neither just nor sound." Given as the foundation of a reason why an insane man should not be called upon to restore the consideration before avoiding his deed, the remark first quoted is unobjectionable, but, applied *as a test* to determine a man's capacity to make a legal conveyance, it is " neither just nor sound." Many a man has unquestionable capacity to make sale of his property, who has not the faculty "*prudently* to manage and dispose of the proceeds of the sale."

We say, then, that a want of absolute and perfect soundness of mind does not necessarily affect the capacity to make a valid conveyance, provided the mind is still capable of fully comprehending the import of the act.

Insane delusions and mental infirmities may or may not be of such a character as to affect the validity of an act of conveyance. Where they *are* of such a character, they are not to be disregarded, and, if directly connected with the act, incapacitating the party from understanding its nature or character, or the results which would flow from it, they would destroy its validity. And this is the true extent and mean-

ing of the case of *Bond* v. *Bond*, 7 Allen, 1, cited for the demandant.

In the case now before us, there is nothing indicating the existence of such delusions. So far as we can gather the facts from the exceptions, the demandant claimed that there was a gradual decay, ending, in old age, in the utter destruction of the mental power of the grantor, and the case seems to range itself more nearly in its facts with those of *Hill* v. *Nash*, 41 Maine, 585, and *Jackson* v. *King*, 3 Cowen, 207, the doctrines of which are too familiar to need rehearsal.

In all cases involving an inquiry of this sort, in order to avoid erroneous conclusions, the strictest attention must be paid to the particular circumstances, so as to ascertain, if delusion and infirmity appear, whether they are so connected with the act, the validity of which is in dispute, as to show that, *as to that act*, the intelligent assenting mind was wanting.

"Every instance must be judged on its own merits, and, while weakness of understanding deserves protection, it should be remembered that too nice an investigation of eccentricities and imperfections may lead to oppression and injustice." Beck's Medical Jurisprudence.

It is not upon proof of a few irrational or absurd acts *merely*, that mental alienation, incapacitating a man for the management of his own affairs, and avoiding his contracts at the option of his heirs, is to be inferred. *Semel insanivimus omnes,* — and are fortunate if *only* once.

The learned Professor Casper, Forensic Physician to the Courts of Justiciary in Berlin, (whose cautious scrutiny, physicians who are called to testify as experts to the mental condition of those whom they have never seen, where an opinion, if formed at all, must be based upon the necessarily imperfect observation and detail of witnesses not experts, would do well to bear in mind and imitate,) remarks as follows; — "Of all the questions which the physician has to treat in medico-legal practice, there is, without exception, no one more difficult to solve than that of the disputed mental

condition of any individual. * * There is difficulty, in many cases an actual impossibility, of determining the limits between mental health and mental disease. Those fortunate individuals gifted by Providence with a perfectly proportionate and completely harmonious development of all the fundamental powers of the mind, representing, as it were, the perfect *norm* of mental health, are extremely rarely to be met with."

"In forensic medicine, in every matter, and nowhere more than in psychological affairs, individualization, the critical examination of the individual case, is the only proper method of inquiry."

Elsewhere he speaks of "the important consequential and dangerous results to which the habit of generalization in medico-legal matters has led." And again, he says, — "there is nothing else for it but to consider the practical circumstances of each case, and the principle of the individualization of each case, in my opinion, ought to be firmly maintained throughout the whole of forensic psychology."

But the authority of the learned need not be quoted in support of these ideas. They are the utterances of the plainest common sense. Apparently the presiding Judge had them in mind when he put the second direct question to the jury and ruled so as to make the case turn upon their answer.

The partially insane or feeble in intellect are responsible even *criminaliter*, if they understood the nature of their acts and knew that they were wrong. It is not every kind or degree of insanity which exempts from punishment. "The test of such insanity as will excuse the commission of crime is whether the accused, at the commission thereof, was conscious that he was doing what he ought not to do. *United States* v. *McGlue*, 1 Curtis' C. C. Reports, 1; *State* v. *Spencer*, 1 New Jersey, 196; *Roberts* v. *State*, 3 Kelley, 310.

And see Casper's Forensic Medicine, vol. 4, p. 238, Case CLXXX, for details of an instance where a man was rightly

held competent for the management of his own affairs without the intervention of a guardian, and actually for years transacted business as a house agent, though all the while laboring under most manifest and obstinate insane delusions, which, however, appeared not to affect his comprehension of business matters. Though not *absolutely*, he was *legally* of sound mind.

Not finding that the excepting party lost anything to which he was rightly entitled by the manner in which this case was given to the jury, or by the rulings in respect to the admission and exclusion of testimony, the entry must be

*Motion and Exceptions overruled.*

*Judgment on the verdict.*

APPLETON, C. J., WALTON, DANFORTH and TAPLEY, JJ., concurred.

———◆———

NATHANIEL F. DEERING, *Ex'r & Tr.*, *versus* MARY P.
TUCKER *& als.*

In a bill in equity, brought to give construction to a will, which, after providing for the payment of all debts and certain specific legacies, and appointing the executors as trustees, further provided, that the remainder of her whole estate, real, personal and mixed, should remain and be kept, for the full period of twenty years from the date of said will, under the care and management of said trustees, for the benefit of certain grandchildren named; that so much of the income of said estate as might be deemed necessary by said trustees, should be applied to the education and support of said grandchildren, and for a suitable provision for them in case of marriage, * * "before said period shall elapse," and the remainder thereof to be judiciously invested until said grandchildren should become entitled to receive their respective proportions; that, at the expiration of said period, the "whole of the" testator's "estate and property" should be equally divided among those of said grandchildren then surviving, and the lawful issue of such as had deceased :— *Held*,—

1. That the trusts were determined at the expiration of the period named;
2. That the devisees, without regard to sex, were to receive equal proportions of the realty in fee simple.

A provision in a will, restricting the rights of the devisees in the control and disposition of estates therein devised to them in fee, is void for repugnancy.

Where a will devised an estate in fee to the testator's grand-daughters, to vest in them at the expiration of twenty years from the date of the will, and provided that said estate should "be so received" (by the trustees having its care and management prior to the expiration of such period,) "for the use and benefit" of said grand-daughters, "as not to be subject to the control and disposition of their or either of their husbands :" — *Held,* —
That the last clause was not in limitation but in furtherance of the rights of the devisees.

APPLETON, C. J. — This is a bill brought by the surviving executor and trustee under the will of Mary Preble, to obtain the legal construction to be given to certain provisions in the same, and to ascertain the mode of executing the trusts created thereby. All interested are made parties to the bill.

Mary Preble, by her last will and testament, appointed her executors as trustees. They were to have the entire care and management of her estate, to be holden and managed by them for the benefit of her grandchildren, a son and two daughters of her only son Edward, agreeably to the provisions and directions contained therein. After payment of all her just debts, charges and legacies, her whole estate, real, personal and mixed, was to remain and be kept under the care and management of the persons named as trustees, to be by them managed with care and prudence for the benefit of her said grandchildren; and so to continue and remain *for the period of twenty years from the time of making this will;* during *which period,* the whole of said property is directed and intended to continue and be kept in that condition, undivided, under the care and management of the executors for the purposes aforesaid, *until the said period shall fully expire.* So much of the income and profits of the estate, as may in their judgment be necessary and proper, was to be applied to the education and support of her said grandchildren and for suitable provisions out of the same, in case of their marriage and coming to have

families *before the period shall elapse;* and the remainder was directed to be invested from time to time in some safe and judicious manner, according to their best judgment, to be added to her said estate, *until* her said grandchildren shall become entitled to receive the proportions respectively intended for them by this will. *At the expiration of said period of twenty years from the date of the will,* the whole of her said estate and property was to be equally divided among those of her said grandchildren who may then be living, and the lawful issue of any one or more that should then be deceased, in the same proportion that would belong to any such grandchild, if living, &c. If all the grandchildren should die without leaving lawful issue in being, *before* the said period of twenty years should expire, then the estate was to constitute a fund for charitable purposes, and the estate to become vested in the new trustees specially designated by the will.

It is apparent that, for twenty years, the grandchildren were to have no control over the estate. It was to be under the care and management of the executors and trustees. Their powers and duties were accurately defined. The trust is limited in time. It embraces the whole estate, and not a fraction. When it ends, it ends as to the whole estate. When the trust expires by the limitation of time, no further duties are to be done by the trustees. The estate, at the expiration of the period prescribed by the will, is to pass from the trustees and to vest in the grandchildren. In every part of the will, in all its various clauses, the trust estate is continued only for the period of twenty years. The trust estate limited in time by the will, and expiring by its own limitation, what then is to become of the estate of which the trustees have had charge since the decease of the testatrix?

The answer to this question is to be found in the ninth clause in the will, which is in these words :—"Ninthly. It is my will that *at the expiration of said period of twenty years* from this time, *the whole of my estate and property*

shall be equally divided among those of my said grandchildren, who may then be living, and the lawful issue of any or more that shall then be deceased, in the same proportion that would belong to any such grandchildren if living. And, if either of my said grandchildren should then be deceased, without leaving lawful issue living at the end of the said time fixed, then the whole shall go to the surviving grandchildren or grandchild, or lawful issue of any deceased grandchild, in such proportion as aforesaid; or, if there be but one surviving grandchild, or issue of but one, then the whole to go to such single grandchild or his or her issue as aforesaid; and that said estate shall not vest in them or either of them before the end of that period in any manner."

The language of this clause is clear and precise. The whole estate is to vest "at the expiration of said period of twenty years." Nothing is to remain in the care or under the management of the trustees. No distinction is made on account of sex. The words used apply irrespective of sex. They cannot be made to vary in their signification because one devisee may be a grand-son and the others daughters. If they give the fee to the grand-son, they give the same estate and none other to the grand-daughters.

"The word "estate," as held in the American Courts, is a word of the greatest extension, and comprehends every species of property, real and personal, and will carry a fee unless restrained. It describes both the *corpus* and the extent of interest." 2 Redfield on Wills, c. 14, § 48. A devise of all "my real estate," without words of limitation, passes a fee simple by force of the word "estate." *Godfrey* v. *Humphrey*, 18 Pick., 537 ; *Putnam* v. *Emerson*, 7 Met., 333. The words "all of the estate" of the testator, pass a fee simple. *Josselyn* v. *Hutchinson*, 21 Maine, 339. Indeed, it cannot for a moment be doubted that the words "all of my said estate and property," as used in this section of the will, give the devisees a fee simple. If they give this to the grand-son, the grand-daughters, by force of the same words, must take an equal estate.

The testatrix then proceeds as follows :—"It is further

herein my express will and direction that my said estate shall go or descend, in no other wise than is by this will directed and provided. And it is moreover my express direction that, in case of the marriage of either of my granddaughters, at any time before they may be twenty-one years of age, or after, it shall be the duty of the said executors * * or whoever may be appointed in their places and be invested with their powers, to secure or cause the portions of property that may be coming to such grand-daughters, *at the expiration* of said period of twenty years, or to either of them, to be *so secured* for their or her own use and benefit, *as not to be subject to the control and disposition of their or either of their husbands;* and this direction not to be altered by any request or consent of either of such grand-daughters thereunto."

The testatrix, by a previous clause, had devised her grandchildren an estate in fee simple, — thus giving to each and alike the complete control over their share in her estate, and the full power of alienation. This last clause was not in limitation but in furtherance of the rights of the grand-daughters. It was to prevent any control of their estate by their husbands, — to preserve their entire rights without let, hindrance or interference on their part.

The "control" to be guarded against was legal control on the part of the husband, by virtue of his marital rights; the "disposition" of their estates to be feared was one in the exercise of those rights. The grand-daughters could not be, nor was it desirable they should be protected from and against the just and natural influence arising from the marital relation, — so far as that might affect their conduct in the management of the estate, or in the spending of their incomes. That influence could only be avoided, by the avoidance of matrimony.

The testatrix did not intend the husbands should have power to lease, mortgage, sell, or in any way dispose of or manage the estate devised, — nor that it should in any way be liable for their debts.

Now, by the existing laws of the State, the objects which the testatrix had in view by the clause under consideration are fully accomplished. By R. S., 1857, c. 61, § 1, "a married woman, of any age, may own in her own right, real and personal estate acquired by descent, gift or purchase ; and may manage, sell, convey and devise the same by will without the joinder or assent of her husband." By § 2, the husband, by marriage since March 22, 1844, "acquires no right to any property of his wife." By § 3, she may prosecute and defend suits at law or in equity, for the prosecution and protection of her property as if unmarried, or may do it jointly with her husband. In *Southard Plummer*, 36 Maine, 64, it was held that a marriage contracted since the Act of 1844, c. 117, conferred upon the husband no ownership in property which at the time belonged to the wife, and that the right to the exclusive possession and control of such property remained in her after the marriage equally as before.

It is apparent, therefore, that a release to the granddaughters will secure the estate to them for "their own use and benefit," so "as not to be subject to the control and disposition of their or either of their husbands."

If the design of the testatrix was to restrict the rights of the grand-daughters in the control and disposition of these estates devised to them in fee, such design would be against law. A provision in a devise of land, that the same shall "not be subject or liable to conveyance or attachment," is void, because repugnant to the estate devised. *Blackstone Bank* v. *Davis*, 21 Pick., 42 ; *Gleason* v. *Fairweather*, 4 Gray, 348.

*N. Webb,* for the complainant.

*J. D. & F. Fessenden,* for the respondents.